Skinner v. Terhune.

WILLIAM E. SKINNER, receiver,

v.

RICHARD P. TERHUNE et al.

THE HACKENSACK SAVINGS BANK

v.

RICHARD P. TERHUNE et al.

1. Conveyance of real estate by a debtor to a corporation of which he was the principal stockholder and sole manager held void as against his creditor under the circumstances stated in the conclusions.

2. Defendant held a judgment against a principal and surety, and a levy upon both real and personal property. The personal property belonged to the principal debtor, and the real estate to the surety. Complainant held a judgment and execution against the surety, and a levy upon the real estate, subsequent to the defendant's judgment.—*Held*, complainant had an equity to compel defendant to proceed to satisfy his judgment out of the personal property so levied upon.

3. A receiver appointed by a common law court, after judgment upon supplemental proceedings, upon a return of the execution, is vested with the title to personalty only.

*Mr. C. H. Voorhis*, for the complainant.

*Mr. John Linn*, for the defendants.

NOTE.—This decree was affirmed on appeal, in *Terhune* v. *Hackensack Savings Bank, 18 Stew. Eq. 344.*—REP.

On bill &c., heard by Hon. Henry C. Pitney, advisory master, who filed the following conclusions :

The defendant, R. P. Terhune, prior to January 1st, 1880, was the owner of the real estate in controversy, situate in Hackensack, consisting of a store-house and dwelling, worth from $14,000 to $15,000 ; a foundry, coal-yard and dock-front worth from $8,000 to $10,000 ; a tenement-house and lot worth from $2,500 to $3,000 ; and a plot of building lots worth $2,000 to $3,000 ; worth in all from $27,000 to $30,000, mortgaged for $15,600, leaving a margin of $12,000 to $15,000.

At that time, however, at a forced sale, it would not have realized so much. He also had a stock of goods in his store and a plant in his foundry worth about $5,000. Besides this he had horses, wagons, carriages and household goods, and furniture and a cow. He also had seventy-two shares of the par value of $1,800, and worth $1,500, of stock in the Hackensack Gas Light Company. Also, $20,000 in railroad bonds of uncertain value. He owed three classes of debts :

*First.* About $5,000 current indebtedness incurred in his regular business as a foundryman and a dealer in coal, hardware and agricultural implements.

*Second.* Several thousand dollars (claimed by him to be $10,000) to his wife and mother-in-law as sole beneficiaries under his father-in-law's will, of which he was executor.

*Third.* A considerable sum (amount not shown) incurred in promoting the building of the railroad whose obligations he held. Among this latter class of obligations, was an indebtedness of upwards of $3,000 for money borrowed from the complainant bank, which indebtedness is the foundation of complainant's judgment.

The result of the situation was, that he was financially embarrassed and unable to meet his obligations.

On the 1st of January, 1880, Terhune organized the Terhune Manufacturing Company, one of the defendants herein.

The capital stock was $10,000, of which $9,800 was allotted to Terhune, $100 to his son-in-law, Morse, a resident of Brooklyn, and $100 to his daughter, Miss Maria E. Terhune, a mem-

ber of his family. Neither of these two last mentioned paid anything on account of their stock.

Terhune conveyed to the company the whole of the property above named, except the gas stock and the railroad bonds, without regard to its character or the needs of the company.

The consideration named in the deed of the land was $25,000, "subject to mortgages amounting to $15,600." He also transferred to its account in bank about $1,000, previously standing to his individual account, and he says the conveyance also included his household goods, horses, wagons, carriages and cow. The company, in payment for this property, issued to him and to his son-in-law and daughter the whole $10,000 worth of stock and, as he says, assumed payment of his business indebtedness.

No statement appears to have been made out at any time, none was produced, showing how the balance was arrived at.

No inventory or appraisement of the personal property transferred was produced, although called for, though it was said that one was actually made and was in the hands of counsel. No statement was produced of the amount of business debts assumed. Such brief examination as I could give the books at the hearing threw little light on the transaction.

Of the stock issued to Terhune, $800 were at first issued to him personally, and afterwards transferred to him as trustee, but of whom trustee the certificate does not show. The remaining $9,000 were issued to him as trustee without naming the *cestui que trust*. He says that he held it as trustee of his wife and mother-in-law, but no written declaration of trust appears to have been executed.

He says he thought at that time that he was indebted to his father-in-law's estate in about the sum of $10,000, but he fails to show how, or to make up a statement showing any such indebtedness. No settlement of his father-in-law's estate has been made, nor any ascertainment of the state of the account. No receipt or acquittance was taken by him for the shares of stock which he says he held in trust for them.

The business of the store and foundry and coal-yard was continued after this transfer to the manufacturing company, precisely the same as before.

Terhune was the sole manager of the business, and had the complete, unquestioned control of it. No salary was fixed for his services. The arrangement was, that he was to attend to the business, and to receive as compensation his house rent and living, including all expenses of every kind for himself and for his family. He freely made use, at his pleasure, of the funds of the company to pay his outside indebtedness, and for all other purposes, precisely as if he were the individual owner. He continued to occupy the dwelling and to use the horses and carriages, and to deal with every particle of the property trans- ferred precisely as he did before the transfer. He says the assignment did not include debts due him, but he collected them, and deposited the money with the company.

He says that, shortly after the organization of the company, he sold his gas stock to the company for moneys which it ad- vanced to him, but the stock was not transferred on the books until the present year. The fact is, that it appears that this stock has been pledged for many years past as security for a loan to a bank for nearly the amount of its value. Whether this pledge was made before or after the organization, does not, as far as I recollect, appear. Terhune continued to act as a director and officer in the gas company, under the ownership of this stock, up to April 1st, 1888.

The Hackensack Savings Bank recovered judgment on its debt November 3d, 1880, and execution on it was returned unsatisfied for want of property.

In February, 1888, supplemental proceedings were taken on this judgment, and Judge Skinner, the complainant, was ap- pointed receiver, and as such filed the first of the two bills seeking relief against the ownership of the manufacturing com- pany, charging the transfer to be fraudulent and void as against creditors and as to both real estate and personal property, and claiming the first lien thereon for the savings bank judgment.

Subsequently, a bill was filed by the bank alone with substantially the same prayer.

Upon a preliminary motion for an injunction upon the bill, answers and affidavits, the learned vice-chancellor held, upon the facts thereby appearing, that the complainant was entitled to the relief sought.

Those facts were not materially varied by the evidence at the hearing. Such additional facts as were then developed appear to me to strengthen the complainant's case. Close examination of the case, after hearing counsel, leads me to the same conclusion with the learned vice-chancellor. The only question is as to the measure and extent of the relief.

Complainant insists that the title to the original stock of goods and plant, or so much of it as still exists, remains in Terhune, and that the newly-purchased goods are also his property, and that all are subject to the lien of the bank's execution.

Defendants plead the statute of limitations, and say that it bars that part at least of the remedy which seeks to reach the personalty.

I have not thought it worth while to determine the effect of the statute, so far as relates to the personal property. It does not apply either in law or in equity to the real estate, and the remedy which I think complainant is entitled to will indirectly, but completely, reach the stock of goods and the plant. As to the gas stock and railroad bonds, it seems clear enough that the statute does not apply to them.

The case is complicated by the recovery of two several judgments against the Terhune Manufacturing Company and R. P. Terhune jointly, one in favor of Mrs. Gaskell for $3,000, and one in favor of Mr. Edward Linn for $2,000, the former being also secured by a mortgage upon part of the real estate in question, executed by the manufacturing company. Upon each judgment executions have been issued and levied upon the land and stock of goods and plant. They are the first levies, and so I must hold that they take precedence in priority over the complainant's judgment, because they are founded on judgments against Terhune as well as against the company.

The evidence is clear that the actual cash was loaned and advanced upon each of these several mortgages and judgments by the plaintiffs therein, and that such loan was, on the part of Mrs. Gaskell and Mr. Linn, made in perfectly good faith.

I do not see how the complainant can avoid the priority of these judgments.

He says the counsel who acted for these creditors, in making these loans, had full notice of the fraudulent character of the manufacturing company organization and of the transfer to it of the property.

Suppose this to be true, still the counsel took care to have Terhune join in the obligations, and, as before remarked, the judgments and executions are against him as well as the company.

The Gaskell money was loaned, and the mortgage and judgment bond given for it, April 1st, 1886; judgment on this bond was not entered until December 29th, 1887. The immediate occasion of entering judgment seems to have been a movement made by a national bank of Hackensack to collect an indebtedness it had against Terhune, dating back, like the one of the complainant, to a period prior to January 1st, 1880. This debt was paid by the company with money borrowed in January, 1888, from Edward Linn, whose judgment to secure it was entered January 19th, 1888. Execution on the Gaskell judgment was issued on the 10th of January, 1888, and was placed in the sheriff's hands January 19th, 1888, just ahead of the Linn judgment.

On the 24th of January, Mr. Linn, attorney of record in all these judgments, wrote to the sheriff a letter stating that Mr. Terhune would hand him a list of property to be levied upon under these executions, and adds, "You may then let the matter rest until further orders." Mr. Linn swears that both these loans were made to the company as principal debtor, and that Mr. Terhune joined in the obligation as surety. The result in equity of this situation of affairs is obvious. Complainant's lien is subsequent to that of Mrs. Gaskell and of Edward Linn, and, granting that the bank can have no remedy as against the

goods levied on by the sheriff, yet the older execution creditors have such remedy, and the complainant, in my judgment, has a clear equity; that they should look to that remedy and exhaust it before resorting to the real estate.

Mr. Terhune swore that the goods levied on are worth $5,000 or $6,000, and that the sheriff, under the instructions of Mr. Linn, as attorney of the execution creditors, has permitted him to go on with the business without interruption or interference. The first bill herein was filed March 7th, 1888, and a copy came to the hands of Mr. Linn immediately. The answer of Mrs. Gaskell was filed March 26th, 1888, on which day a preliminary hearing on the motion for an injunction was had before the vice-chancellor. All the defendants had prompt notice of the proceedings, and the execution creditors had immediate notice that the priority of their lien was challenged, still they did not enforce their levies.

Under these circumstances, if any of the goods levied upon have been eloigned, the execution creditors must, in my judgment, be charged with their value as against complainant's execution, which was issued and levied after the bill was filed.

As to the gas stock and the railroad bonds and stock, the title to them has passed to the receiver by the judge's order and the assignment thereunder executed by Terhune. Complainant Skinner is entitled to have a declaration that the title therein of the manufacturing company is void as against him, and the manufacturing company must transfer those assets to the receiver, and he will be declared entitled either to redeem them, if he sees fit to do so, or to sell them at auction, subject to the lien of the several pledgees.

The particular office of each of the two bills filed herein, one by the receiver and the other by the savings bank, was not discussed at the hearing. The question whether, under our statute, the receiver is vested with any interest in the real estate or not, was not discussed. I do not understand that question was decided in *Miller* v. *Mackenzie, 2 Stew. Eq. 291*, which was a case involving the title to personal property only, and so that case does not seem to me to necessarily overrule *Higgins* v. *Gille-*

*sheiner, 11 C. E. Gr. 308,* in which a bill was filed by the receiver to set aside a fraudulent transfer of real estate.

It has always seemed to me, that the act under which the receiver herein was appointed vests him with title to personalty only, therefore, without calling for argument on this point, or making an extended examination of the law, I shall hold, for the purpose of these suits, that the receiver must be confined to relief against the fraudulent transfer of the gas and railroad bonds and stock.

In the savings bank suit, I will advise a decree that the conveyance of January 1st, 1880, be declared fraululent and void as against the complainant, and enforcing the equity above stated against the prior executions of Mrs. Gaskell and Mr. Linn. These creditors must proceed to sell the chattels levied on under their executions, and if any of those levied on are not forthcoming at the sale, and those found and sold do not produce sufficient to satisfy their executions, an account must be taken of the value of those not forthcoming.

If they decline to proceed with the sale of the chattels, they must be considered as waiving their lien on the land.